**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ROBERTO PEREZ, JR., | § | |
| (TDCJ-CID #01189927) | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION H-16-0306 |
| | § | |
| BRAD LIVINGSTON, et al., | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

I.  **Procedural History and Background**

Plaintiff Roberto Perez, Jr., a state inmate proceeding pro se, filed this section 1983 lawsuit against prison officers for the alleged violation of his constitutional rights. Perez sues the following officials at the Estelle Unit: Arij Ramadan, correctional officer; Amber Taylor, correctional officer; James McClellan, sergeant; Jim Pittcock, correctional officer; and Christopher LaCox, Warden. He also sues Brad Livingston, Executive Director of the TDCJ-CID. In this lawsuit, Perez complains of the use of excessive force, criminal conspiracy, violations of his First Amendment rights, denial of medical care following the incident, and, as to LaCox, failure to supervise and investigate.

Defendants LaCox, Ramadan, Taylor, McClellan, and Pittcock filed a motion for partial summary judgment, (Docket Entry No. 26), to which Perez filed a response in opposition (Docket Entry No. 42). On March 9, 2018, this Court granted the Defendants' motion for partial summary judgment (Docket Entry No. 26). (Docket Entry No. 47).[1] Perez's claims for monetary damages

---

[1]Perez names as defendants in their official capacity John A. Rupert, Pamela Pace, and Doe V. These defendants are located in Anderson County, and the alleged events giving rise to their liability in this lawsuit occurred in Anderson County. Anderson County is located within the jurisdiction of the United States District Court for the Eastern District of Texas, Tyler Division. Perez concedes in his pleading that

against the Defendants in their official capacity were dismissed with prejudice. Perez's claims against the Defendants for criminal conspiracy, violation of his First Amendment rights, and deliberate indifference to his serious medical needs, were dismissed with prejudice. This Court dismissed Perez's claims against Defendant LaCox in his individual capacity. Perez's claims against Defendants Ramadan, Taylor, McClellan, and Pittcock for use of excessive force were retained for further proceedings.

Defendants Ramadan, Taylor, McClellan, and Pittcock ("Defendants") filed a motion for summary judgment. (Docket Entry No. 51). Perez responded. (Docket Entry No. 60).

Having carefully considered the motion, the response, the probative summary judgment evidence, the record, and the applicable law, the Court grants the motion for summary judgment, as follows.

## II.     Perez's Allegations

In this Court's Order entered on March 9, 2018, this Court briefly summarized Perez's allegations as follows:

> For purposes of the pending motion, plaintiff alleges that Warden Christopher LaCox ("LaCox") and correctional officers Arij Ramadan ("Ramadan"), Amber Taylor ("Taylor"), James McClellan ("McClellan"), and Jim Pitcock ("Pitcock"), violated his civil rights at the Case Estelle Unit on June 30, 2015. He claims that on that date, during a temporary two-day assignment to the Estelle Unit from the Coffield Unit, he was subjected to an unreasonable use of force by defendants Ramadan, Taylor, McClellan, and Pitcock. He asserts that the water in his shower had been too hot, and that Ramadan and

jurisdiction for these three defendants lies in the Eastern District of Texas. (Docket Entry No. 1, p. 9.) Consequently, Perez intentionally and knowingly filed his claims against these three defendants in a court of improper jurisdiction. Perez's claims against Defendants John A. Rupert, Pamela Pace, and Doe V are dismissed without prejudice, subject to being pursued in a timely manner in a court of appropriate jurisdiction.

Taylor refused to lower the temperature. The officers ordered plaintiff to exit the shower, but he refused and demanded that a ranking officer be called to the scene. The parties dispute how it occurred, but Ramadan sustained a scratch along her arm. Defendants Pitcock and McClellan arrived to restrain plaintiff and return him to his cell. Plaintiff claims that Pitcock, McClellan, Taylor, and Ramadan physically assaulted him without provocation during the return to his cell, causing him serious injury. The defendants allege that their conduct was a reasonable use of force necessitated by plaintiff's attempts to break away from the group. A video camera team was called to tape the use of force, but it was only able to record the end of the incident and plaintiff's ensuing cell-side medical examination. Plaintiff was transferred back to the Coffield Unit the next day.

(Docket Entry No. 47).

With regard to the events surrounding the use of force, the Court considers Perez's detailed account of events as set forth in the complaint. Perez alleges that on June 29, 2015, he was transferred to the Estelle Unit for a medical appointment at John Sealey Hospital in Galveston, Texas. Perez was placed in the main building, transit/solitary area of the prison, cell 106; Perez explains that this area of the Estelle Unit does not have video surveillance.

On the morning of June 30, 2015, John Sealey appointments were canceled. Defendant Ramadan escorted Perez to the one row shower. The shower was scalding hot, and Perez asked Defendant Ramadan if she could lower the water temperature. Ramadan refused and told Perez to either shower or return to his cell. Defendants Ramadan and Taylor denied Perez's request for a ranking officer. Defendant Ramadan turned off the water and told Perez he could stay in the shower all day. Perez again repeated his demand for a ranking supervisor, and Ramadan began to snatch Perez's clothes from the bars. Perez grabbed his shorts, the ones he entered the shower with, just so he wouldn't be naked in the shower. Ramadan sprung and grabbed Perez's shorts at the same time, and proceeded with a tug of war with Perez for about a minute. When Defendant Ramadan saw

3

that Perez would not let go, Ramadan threatened Perez with the pepper spray. Ramadan became angry, left the area, and called Defendant Pittcock. At no time did Ramadan allege Perez assaulted her, nor did Perez believe Ramadan would concect a scheme alleging that Perez had assaulted Ramadan.

Ramadan stood behind Pittcock, and Pittcock ordered Perez out of the shower. Again Perez refused unless the Defendants brought a ranking supervisor. Defendant McClellan entered the solitary area. Perez began to explain to Defendant McClellan what had happened in the shower with Ramadan and Taylor. Defendant McClellan said, "Okay, let's go back to the cell." Perez submitted to hand restraints, and Defendant Pittcock approached the bars and placed the handcuffs on Perez's wrists until it cut the blood circulation from his wrists, causing him extreme pain and unnecessary suffering. The shower door was opened, and Perez was then ordered to turn around and step out of the shower backwards, and Perez complied. Upon stepping out of the shower, Defendant McClellan told Defendant Ramadan to "[g]o ahead and write a disciplinary report for a staff assault." Perez then denied assaulting anyone.

Perez began to walk back to his cell escorted by Defendants Pittcock and McClellan. Upon reaching cells 104 and 105, Defendant McClellan began to grip and twist Perez's arm, causing him pain. Perez believes that Defendant McClellan was trying to provoke Perez into pulling away, thereby giving security staff a justification for using force. Perez ignored the pain so that he could just be placed in his assigned cell. Defendant McClellan began to yell, "Slow down! Slow down!"

Perez was between cells 105 and 106 where he could not be seen by other prisoners. Defendant McClellan again yelled, "He's resisting! He's resisting!" At that instant, Pittcock punched Perez on the side of the head with a closed fist with such force that it knocked Perez to the ground

4

and nearly caused him to lose consciousness. Both Defendants McClellan and Pittcock began punching Perez with extreme force in the face and the sides of the head. Perez was handcuffed with his hands in the back and unable to block or protect his person. Defendant McClellan then began to knee Perez's back and spine repeatedly.

Defendant Pittcock stopped punching Perez, grabbed his hair, placed his face right up against Perez's face, and said, "This is what you get when you f--- with us!" Defendant Pittcock then drove his finger into Perez's right eye, and Pittcock began twisting his finger, causing him extreme pain and suffering. Defendant Pittcock then pulled his finger out, and put his face in Perez's face and said, "You like that ------ f-----?!!", and proceeded to drive his pen into Perez's eye, and began twisting the pen in his right eye socket, causing Perez further pain and suffering. Perez began yelling and screaming from the pain caused by Defendants McClellan and Pittcock. Pittcock began attempting to break Perez's pinky and ring fingers by bending both of them backward with his body weight.

Perez felt another set of little fists punching Perez in the eye very quickly. Another set of hands were pressing Perez's legs in a crisscross manner with extreme pressure. Someone was stomping Perez's ankles, legs, and knees. Defendant Pittcock began slamming Perez's head into the floor. A female sergeant entered the area and began talking into the camera. In this video, Perez is not struggling or acting in a violent or aggressive manner. Upon being lifted up by the two new security staff officers, Perez informed the female sergeant that Defendant Pittcock stuck a pen in his eye. Perez was placed in his cell. Perez was not taken to the infirmary, although a senior nurse did a quick examination of Perez and visited him twice that day. The same senior nurse took Perez's blood pressure, found it to be very high, and ordered Defendant Pittcock to take Perez to the infirmary for medical treatment. Perez was returned to the Coffield Unit on August 1, 2015.

The Defendants seek summary judgment as to Perez's claim for use of excessive force.

## III. The Motion for Summary Judgment

### A. The Standard of Review

Summary judgment should be granted when the moving party conclusively establishes that there is no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). There is no issue for resolution at trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party may satisfy its burden by negating the existence of an essential element of the nonmoving party's case. *Celotex Corp.*, 477 U.S. at 325. Alternatively, if the moving party will not bear the burden of proof at trial on a particular issue, it may meet its initial burden by pointing out the absence of evidence supporting that element of the nonmoving party's case. *Id.; Stults v. Conoco, Inc.*, 76 F.3d 651, 656 (5th Cir. 1996); *Transamerica Ins. Co. v. Avenall*, 66 F.3d 715, 718-719 (5th Cir 1995).

Once the moving party has carried its burden, the burden shifts to the nonmoving party to show that summary judgment is not appropriate. *Exxon Corp. v. Baton Rouge Oil*, 77 F.3d 850, 853 (5th Cir. 1996). The nonmoving party cannot discharge its burden by alleging legal conclusions or unsubstantiated assertions, nor can it rest on the allegations of the pleadings. Instead, it must present affirmative evidence in order to demonstrate the existence of a genuine issue of material fact and defeat a motion for summary judgment supported by competent evidence. *Anderson,* 477 U.S. at 248-250; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372,

6

380 (2007). When the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Id.* However, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt the version of the facts for purposes of ruling on a motion for summary judgment. *Id.*

Substantive law determines what is material. *Anderson,* 477 U.S. at 249. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.,* at 248. If the nonmovant sets forth specific facts in support of allegations essential to his claim, a genuine issue is presented. *Celotex,* 477 U.S. at 327. However, this is so only when there is "an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994). This burden cannot be met with "some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, "conclusory allegations," *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 871-73 (1990), "unsubstantiated assertions," *Hopper v. Frank,* 16 F.3d 92 (5th Cir. 1994), or by a mere "scintilla" of evidence, *Davis v. Chevron U.S.A., Inc.,* 14 F.3d 1082 (5th Cir. 1994). In the absence of proof, the court does not assume that the nonmoving party could or would prove the necessary facts at a later point. *Little,* 37 F.3d at 1075.

Although a pro se plaintiff's pleadings are held to a less stringent pleading standard than those drafted by attorneys and are entitled to a liberal construction, *Haines v. Kerner,* 404 U.S. 519, 521 (1972), they must still comply with the rules of civil procedure and make arguments capable of withstanding summary judgment. *Hulsey v. Texas,* 929 F.2d 168, 171 (5th Cir. 1991).

**B.    The Defendants' Summary Judgment Evidence**

In support of their motion for summary judgment, the Defendants offer the following exhibits:

(A)    TDCJ Use of Force Report No. M-04078-06-15 regarding Offender Perez, with photographic and video documentation (Bates Nos. 1-41); and

(B)    Relevant portions of TDCJ Medical Records regarding Offender Perez (Bates Nos. 42-80).

The Court has reviewed Perez's medical records following the use of force and provides the following summary:

(1)    June 30, 2015:

Perez was seen for a pre-segregation evaluation. Perez was examined cell-side following the use of force on June 30, 2015. Perez had a .5 cm cut below his right eye and a minor cut to the inner right side of his right little finger. "No other injuries were voiced or noted." (Docket Entry No. 51-2, p. 6).

(2)    June 30, 2015:

Perez denied any injuries and any respiratory difficulty. Perez had a minor .5 cm laceration below his right eye and a minor laceration on the inner side of his right hand little finger. Nurse Lang determined that Perez had no adverse health effects from the use of force. (Docket Entry No. 51-2, p. 3). A list of Perez's current medications included: Ibuprofen; calcium carbonate; vitamin D; and polyvinyl alcohol eye drops (artificial tears). The nurse prescribed Linoxin, which is used to treat heart failure or certain types of irregular heartbeat such as chronic atrial fibrillation. (*Id.* at 3, 7).

(3)     July 1, 2015:

In a Correctional Managed Care Medical and Mental Health Transfer Screening, Nurse Lane noted that upon arrival at the Coffield Unit, Perez's appearance was clean and neat. Nurse Lane did not note any cuts, bruises, or physical deformities. (Docket Entry No. 51-2, p. 8). Nurse Lane noted that Perez had experienced extremity pain since 2009. (*Id.* at 9). Perez had been diagnosed with degenerative arthritis on July 24, 2014.

(4)     July 8, 2015:

Perez's appearance was clean and neat. He did not have any cuts, bruises, sores, or physical deformities. (Docket Entry No. 51-2, p. 12). Perez reported experiencing extremity pain since October 6, 2009.

(5)     July 17, 2015:

Perez complained of pain in his back, neck, fingers, and eyes. Perez reported experiencing pain following the use of force on June 30, 2015. Perez stated that the pain was intermittent and aggravated by daily activities. Perez reported that the character of the pain depended on the time of day, and the frequency varied. Nurse Martin noted that Perez's joints were normal. Perez had full range of motion in his upper and lower extremities and neck. Perez was able to bend forward and backward. Perez's movement and gait were normal. His posture was erect, and he was able to sit easily. Nurse Garner advised Perez that warm water in the shower could reduce discomfort. Nurse Garner prescribed Acetaminophen, two tablets three times a day for three days. (Docket Entry No. 51-2, pp. 21-24).

(6)     August 4, 2015:

Visual acuity test. Far vision: right eye 20/70; left eye 20/40; both eyes 20/40. Near vision:

9

right eye 20/100; left eye 20/70; both eyes 20/70. Perez was referred to optometry. (Docket Entry No. 51-2, p. 25).

(7)     August 16, 2015:

Perez complained of injuries following the use of force. He asked to see a provider regarding injuries to his fingers and eye. He complained of pain in his back, neck, and eye. He further complained of possible nerve damage to both legs as a result of the use of force. Nurse Martin noted that the use of force took place on June 30, 2015; he was treated for minor cuts under his right eye and right little finger. Both areas have resolved; Perez had been evaluated by a provider; a visual acuity test was performed on August 4, 2015; Perez has full range of motion in his upper and lower extremities; he denies any pain or discomfort during the examination. Nurse Martin diagnosed Perez with extremity pain due to arthritis and other disorders of the eye. He was prescribed Acetaminophen. (Docket Entry No. 51-2, pp. 28-29).

(8)     August 25, 2015:

Perez complained of pain in his back, neck, and fingers. He further complained of possible nerve damage to both legs. Nurse Pierson diagnosed Perez with arthritis degenerative, extremity pain.

(9)     August 30, 2015:

Perez complained of injuries following the use of force. He mentioned pain in his right hand and digits, left hip, and leg. He complained of a throbbing pain or ache. He stated that the pain was radiating. Perez reported that he noticed changes to moles on his torso. Nurse noted that Perez had multiple pinpoint flesh-colored moles scattered over the anterior and posterior torso. Nurse Martin advised Perez that warm water in shower can reduce discomfort. He was prescribed Acetaminophen

for three days. (Docket Entry No. 51-2, pp. 36-38).

(10)    September 3, 2015:

Perez complained of nerve damage to his bilateral lower extremities. He also complained

of pain in his neck, back, and fingers. He stated that his prescriptions for Ibuprofen had to be

renewed because he was the subject of multiple uses of force. Nurse Assava performed a

musculoskeletal evaluation and noted: full range of motion in neck and spine, no swelling or

deformity was noted. Perez had full range of motion in both lower extremities. He was able to

ambulate and sit and stand without difficulty. Perez had good muscle strength and tone. There was

no muscle atrophy, and sensation was intact. Nurse renewed Perez's prescription for Ibuprofen for

thirty days. (Docket Entry No. 51-2, pp. 40-41).

The Court has reviewed the use-of-force records and provides relevant excerpts:

On June 30, 2015, Lieutenant Donald McMurrey prepared a use of force report in which he

stated that medical staff noted that Perez received minor injuries consisting of a .5 cm cut under his

right eye and a minor cut on the fifth digit of the right hand due to the use of force. (Docket Entry

No. 51-1, p. 11). Sergeant Gunnels took still photos of the offender, front and back. He also took

photographs of the two injuries. The photographs were taken after the use of force was terminated

because a still camera was not available at the time. The use of force video was omitted because no

offenders were in the area at that time. Due to the layout of the facility, the offender was not in full

view at all times. (*Id.*).

James McClellan made the following use of force report:

> On 6/30/15 at approximately 0725 hours, I Sgt. James McClellan was
> contacted by Jim Pittcock CO V via telephone. Officer Pittcock
> informed me that Offender Perez, Roberto #1189927 had assaulted

Officer Arji Ramadan CO III by grabbing her right arm. Officer Pittcock said that when he went to return to his cell that the offender refused to submit to hand restraints until he spoke with a supervisor. When I arrived on A Wing, I questioned Offender Perez. He stated that the water was to hot and wanted to adjust the water temperature and that Officer Ramadan refused to do so. He said he argued with her about it and she went and turned the water off. I then explained to him that the length of time scheduled for each shower and the water temperature is the same for all offenders and that he needed to return to his cell. I then ordered him to submit to hand restraints and he complied with the order. Officer Pittcock applied the hand restraints and opened the door. The offender was ordered to back out of the shower and the offender complied. I took control of the offenders left arm and Officer Pittcock took control of offenders right arm. As we proceeded to A 106 I instructed Amber Taylor CO III to contact the infirmary and request a nurse for a cell side physical. The offender then turned his head towards me and asked nerveously why we need a nurse. I told the offender he was being charged with staff assault which required a PHD physical. The offender got upset and started to pull against us as he questioned me. I ordered the offender to stop resisting and he refused. The offender started cursing me and pulling away as the offender got more upset the harder he pulled. He then jerked his arm away from my grip and turned towards Officer Pittcock in an aggressive manner. Officer Pittcock and I placed our arms around the offenders upper body and placed him on the floor utilizing down ward pressure. As the offender struggled with us, he was cursing and threatened me. I ordered the offender to stop resisting and he refused. Officer Amber Taylor initiated ICS via radio. We continued to apply downward pressure controlling the offenders abnormal behavior. The offender finally calmed down and stopped resisting. Additional staff arrived and I was relieved by Officer Clarence Pryor CO IV on the offender's left side. I then returned to my normal duties.

(Docket Entry No. 51-1, pp. 13-15).

Jim C. Pittcock made the following use-of-force report:

On 6-30-15 at approximately 0725 hours I contacted Sergeant McClellan due to being informed that Offender Perez, Roberto, No. 1189927 had assaulted Officer Arij Ramadan. Sergeant James McClellan immediately responded and spoke with the offender housed in the shower. Sergeant McClellan then instructed me,

Officer Jim Pittcock CO V, to apply restraints for escort to the cell. I applied restraints and opened the shower door. I took hold of the offender's right arm and Sergeant took control of the offender's left. We proceeded to escort the offender to cell A1-106. Prior to arrival, Sergeant McClellan instructed Officer Amber Taylor CO 3 to have medical care for a cell-side physical. The offender immediately became aggressive asking why medical had to be involved. When told they were coming to do a PHD physical, the offender exploded into a belligerent fit, attempting to pull away. The offender would not stop resisting McClellan. So McClellan then grabbed the offender around the waste and applied downward pressure. The offender was secured facedown on the floor. Officer Taylor called for additional staff and a supervisor. Additional staff arrived and I was relieved of the offender's right side by Officer Johnathan Lopez CO III. I then returned to my normal duties.

(Docket Entry No. 51-1, pp. 17-18).

Chesney Gunnels made the following use-of-force report:

On 6/30/15 at 0725, I Sergeant Chesney Gunnels responded to ICS call at A1-106. When I arrived on scene, Offender Perez, Roberto TDCJ #1189927 was laying on the floor in a prone position in front of A1-106 cell with hand restraints on. At this time, I Sergeant Gunnels assumed command of the incident. Officer Pryor, Clarence CO IV and Officer Lopez, Johnathan CO IV relived the original participants. Officer Pryor had control of the offenders left arm and Officer Lopez had control of his right arm. Officer Taylor, Amber CO III gave me a brief description of who took place prior to my arrival. Officer Thuo, Joseph CO IV arrived with video camera, and I Sergeant Gunnels instructed him to turn on the camera. I Sergeant Gunnels gave a brief narration of the events that took place. I Sergeant Gunnels instructed Officer Pryor and Officer Lopez to assist offender Perez to his feet, so that LVN Sheryl Lane could perform and cell side physical. On completion of the physical LVN Lane stated that offender Perez at minor injuries at this time Officer Pryor and Officer Lopez place offender Perez in the cell. Officer Pryor removed the hand restraints. I Sergeant Gunnels read the offender participation statement to offender Perez and gave it to him. At this time offender Perez was secured in his cell and I terminated the use of force. I Sergeant Gunnels did not state on camera the video camera operators name and rank.

(Docket Entry No. 51-1, pp. 21-22).

J. Thuo made the following use-of-force report:

> On 6/30/15 at 0725 am, I Officer Joseph responded to a call for additional staff to report to A1. When I arrived offender Perez, Roberto #1189927 was lying on the floor in hand restraints. Sergeant James McClellan and Jim Pittcock CO V were kneeling down next to the offender. Sgt. McClellan was relieved by Officer Clearance Pryor CO III and Pittcock was relieved by Officer Jonathan Lopez CO III on the offenders right side. Sgt. Chelsea Gunnels arrived and assumed command of the incident. I was instructed by Sgt. Chelsea Gunnels to record the incident with the video camera. Sgt. Gunnels gave a brief narrative of the incident then instructed the escorting officers to assist the offender to his feet. Licensed Vocational Nurse Sheryl Lane administered cell side physical examination of the offender, noting that the offender received minor injuries due to use of force. Then the offender was escorted to his cell and door secured then Office Pryor removed the hand restraints. Then Sgt. Gunnels read the Offender Participant Statement the Sgt. Gunnels terminated the use of force and ordered me to turn off the video camera.

(Docket Entry No. 51-1, p. 23).

Jonathan Lopez made the following use-of-force report:

> On the time and date listed above, I Officer J. Lopez responded to a use of force on A wing. When I arrived, offender Perez, Roberto #1189927 was on the floor in the prone position and in hand restraints. The offender was not resisting and Sgt. McClellan and Officer Pittcock were holding security over the offender. I relieved Officer Pittcock on the offenders right side. Sgt. Chesney Gunnels arrived and assumed command of the incident. Sgt. Gunnels gave a brief narrative of the incident then instructed the escorting officers to assist the offender to his feet. LVN Sherl Lane administered a cell side physical examination of the offender, noting that the offender received minor injuries due to the use of force. Once the offender was secured, I then resumed to my normal duties. Officer Thuo, Joseph CO IV was the camera operator during the incident.

(Docket Entry No. 51-1, p. 24).

Clarence Pryor made the following use-of-force report:

On 6/30/15 at approximately 0725, I Officer Clarence Pryor CO IV responded to an ICS. When I arrived on scene, Offender Perez, Roberto #1189927 was secured lying in the prone position on the floor. I immediately retrieved Sgt. James McClellan and Officer Johnathan Lopez CO III relieved Officer Jim Pittcock CO V. Sgt. Chelsea Gunnels arrived and assumed command of the incident. Sgt. Gunnels then gave a short narration of the situation. She then instructed Officer Lopez and I to assist the offender to his feet. LVN Sheryl Lane conducted a physical examination at the cell side of the offender. LVN Lane noted that offender Perez received minor injuries due to the use of force. Officer Lopez and I then secured the offender in his cell. I took the offender out of hand restraints once he was secured inside the cell. The use of force was terminated and I returned to my normal duties.

(Docket Entry No. 51-1, p. 25).

Arij Ramadan made the following use-of-force report:

On the date and time listed above, I officer Arij Ramadan, CO III, put Offender Perez, Roberto TDCJ 1189927 into the A1-1 row shower. Offender Perez began arguing about the temperature of the water. When I told him the temperature was the same for every offender, he then became aggressive and grasped my right arm through the bars. I pulled my arm away from said offender and notified Officer Jim Pittcock CO V, of the incident. Officer Pittcock then notified Sergeant James McClellan by telephone. Sergeant McClellan arrived on scene and I returned to my normal duties. I then heard Officer Taylor, Amber CO III, initiate an incident command system for an officer fight on A1-1 row and I responded to the scene. When I arrived on scene, said offender was already placed on the ground and the situation was under control.

(Docket Entry No. 51-1, p. 26).

Amber Taylor made the following use-of-force report:

On 6-30-15, Sergeant James McClellan arrived on A-wing to speak with Offender Roberto Perez, TDCJ No. 1189927. Officer Jim Pittcock CO V placed hand restraints on the offender and opened the shower door allowing Offender Perez to back out of the shower. I, Officer Amber Taylor, CO III, opened the wing door to A1-1 row to allow Sergeant McClellan and Officer Pittcock to escort Offender

Perez to A1-106. Sergeant McClellan told me to call medical for a cell-side physical. While on the phone with medical, I heard a call for assistance. I returned to A1 where I saw Officer Pittcock and Sergeant McClellan restraining Offender Perez on the ground at which time I, Officer Amber Taylor, CO III, initiated an ICS. Sergeant Gunnels, Chelsea, arrived and took command of the situation. At this time the situation was under control and I returned to my normal work duties.

(Docket Entry No. 51-1, p. 27).

### C. Perez's Summary Judgment Evidence

Perez submits the following summary judgment evidence:

(A)     Perez's Exhibit 643-644, Security Staff Assault on Offender Perez, (Docket Entry No. 60, pp. 28-31);

(B)     Affidavit I, Perez's Affidavit of Cited TDCJ Disciplinary and Rules and Policies, (Docket Entry No. 60, pp. 32-33);

(C)     Affidavit II, Perez's Affidavit in Support of Response to Defendants' Motion for Summary Judgment, (Docket Entry No. 60, pp. 34-38);

(D)     Affidavit III, Perez's Affidavit in Support of Response to Defendants' Motion for Summary Judgment, (Docket Entry No. 60, pp. 39-41); and

(E)     Relevant portions of Perez's medical records, (Docket Entry No. 51-2, Ex. B, pp. 1-41).[2]

Perez submitted an affidavit in which he described the use of force on June 30, 2015 as follows:

I, Roberto Perez, Jr., the Complainant, is competent to make this affidavit of the facts on June 30th, 2015 at the Estelle Unit (TDCJ);

---

[2]The Court notes that these medical records are duplicative of those submitted by the Defendants.

On June 29, 2015 I was taken to the Estelle Unit for a medical appointment at John Sealey in Galveston. Upon arriving, I was placed in the main building, transit area, cell 106.

On the morning of June 30th, 2015, no chain was called, I later found out John Seeley appointments were canceled. Correctional Officer Arij Ramadan escorted me to the one row shower. The shower was scalding hot, and I asked Ramadan if she could lower down the hot water. She stated, "No." She said, "No one else was complaining." Again I asked, "If she could turn down the hot water." She said, "No. Either shower or go back to your cell." I told her the water was too hot, and that I could not get under it. Again this request was denied.

I proceeded to ask Ramadan's co-worker Correctional Officer Taylor, and she answered with an aggressive manner, "What!? What!?" I asked her if she could turn down the hot water. And CO Ramadan stepped in, and said, "No! We're not turning down the hotwater." I said, "Will you get some rank down here?" And CO Ramadan became belligerent, "No! No! We're not getting rank either, we're not turning the hot water down, what the f--- are you going to do shower, or get the f— out." "Whoa! Whoa! I can't get under the water. Go get rank down here!"

CO Ramadan turned off the water. I repeated my demand for rank, and, and CO Ramadan snatched my clothes (boxers) from the bars, and I grabbed the shorts I entered the shower with, so I would not be naked in the shower. CO Ramadan grabbed them at the same time, and proceeded with a tug of war, and attempted to goad CO Taylor to pull out her pepper spray to spray me. CO Ramadan said, "Come on we'll spray together, spray! Spray!" CO Taylor semmed hesitant and did not spray, and CO Ramadan left to speak with her co-worker Correctional Officer Pittcock, Jim.

CO Ramadan stood behind CO Pittoock and again I refused to come out unless the security staff brought rank. Again CO Ramadan left.

About five minutes later, CO Taylor went to my cell and obtained my TDCJ ID card. And a Sergeant entered the area. I do not know his name, except he was middle age between 50-55 years of age with salt and pepper hair, and had the appearence of an Italian, hispanic, or anglo.

I explained to the Sergeant (James McMcellan) what had happened with the shower and CO Ramadan. The Sergeant said, "Okay, let's go back to your cell." And submitted to hand restraints, and CO Pittcock put them on until it cut blood circulation from my wrists. I turned around and complied by stepping out backwards.

17

The Sergeant said to CO Ramadan to write a disciliary for a staff assault. I said, "Hey, I didn't assault nobody!"

I began to walk back to my cell with McClellan and CO Pittcock, one to the right and the Sergeant to my left. When we got between 104 and 105, the Sergeant began to grip and twist my arm. I guess to cause me to pull away, and the Sergeant said, "Slowdown! Slow down!"

As I was, three to four feet from my cell, the Sergeant yelled "He's resisting! He's resisting!" At that moment, CO Pitcock punched me right on the side of the head, almost knocking me unconscious. Both the Sergeant and CO Pittcock began punching my face and the side of my head. The Sergeant then began kneeling my back and spine with his knee. Right then CO Pittcock put his face right in mine, and he said, "This is what you get when you f--- with us!" CO Pitcock then drove his finger into my eye and began to twist his finger. CO Pittcock pulled out his finger, and said, "You like that ------ F-----?!" And drove his pen into my eye and began to twist his pen in my eye. At that moment, I felt other fists, little ones, punch me in the eye like four times, and another set of hands pressing my legs criss-cross with extreme pressure, then some one jumping on my legs. The one punching my face was CO Ramadan. When she stoppeded, the Sergeant began punching me and jumped on me. CO Pittcock attempted to break my fingers both pinky and ring fingers.

The Sergeant allowed some one else to take over as more security came upon the wing, and another took CO Pittcock's position. And a female Sergeant began talking into the camers. I was lifted up off the floor, and I did not see the Sergeant in the area who assaulted me with CO Pittcock and the two females. I was not taken to medical, and I was I was placed in my cell. CO CO Ramadan returned my TDCJ ID card all scratched up.

This is what occurred on the morning of June 30th, 2015. I was not fed that day, nor was I ever taken to medical. The medical nurse came to my cell three times to treat and keep an eye on me.

This is my second trip to prison, and have been in for 23 years and have never assaulted any staff, especially no female and over water. I came up for SCC Friday and I was trying to go to G.R.A.D. I did not cause this assault, I merely wanted the hot water lwered. CO Ramadan, CO Taylor, CO Pittcock, and the Sergeant alleged that I assaulted CO Ramadan in order to beat me up. I did not touch anyone.

(Docket Entry No. 60, pp. 28-31).

Perez submitted an affidavit in which he described the medical care he received following the alleged use of force:

> 1. The Plaintiff arrived on the Coffield Unit July 1, 2015, and spoke with the nurse doing the intake. He informed her the Defendant[s] had beaten him on the Estelle Unit. On this date, the Plaintiff's eye was black, and bloody red around the orb part of his eye. He had not showered in 3-4 days, nor did he have clean clothes. He had believed, as he should, the nurse would set him for a sick-call, the following morning, the Plaintiff sent in a sickcall, and immediately sent Captain Sean Marshall a copy of the affidavit the Plaintiff sent with his step 1 grievance and the UOF Participation Statement.
>
> 2. Plaintiff was not called to the sick-call, and immediately left on chain before the sick-call appointment. On July the 8th, 2015, Plaintiff arrived on the Coffield Unit and was seen again by the same nurse doing the intake, Plaintiff reminded the nurse of the sick-call, and she stated the Plaintiff would be called as soon as they got around to it. At this time, Plaintiff's eye was no longer black, but yellow and green, except the orb was still blood-red. By July 10th, Plaintiff had still not called to his sick-call, and Plaintiff's wrist, legs, back, head was hurting. When the Plaintiff complained, a lieutenant called the Plaintiff to his office, and the lieutenant escorted the Plaintiff to the infirmary. The nurse did not examine him, but looked at his foot - nothing else, though she was in possession of the sick-call dated July 10th, the nurse it seem, was avoiding an actual examination intentionally. The Plaintiff was not seen by a nurse until on or about July 17 or for a sick-call, when the Plaintiff went in for the appointment, the nurse was asleep. Plaintiff was not in the room (2) two minutes, and the nurse issued asprin, antacids, and cold busters. This was the regular remedy for all ailments on the Coffield Unit. The nurse did not get up to examine the Plaintiff, except she had informed him an appointment was scheduled to see the provider, which did not arrive until a month and a half later 9/3/15, and only because of the grievance filed against the medical department for intentionally prolonging any treatment, until his injuries had subsided and or dissipated.
>
> 3. Plaintiff has had severe nerve damage that are the direct result of Defendant(s) action, and has been taking medication for the pain. At first it was ibuprofen, except the provider explained that there could be sideaffects from long term use, and the Plaintiff was placed on

nortriptyline for almost two years until recently, the provider made clear recent studies have shown a medication called "Cymbalta" is more effective for "neuropathy," "nerve damage." This cross over was made by the provider in the Plaintiff's best interest July 10, 2018. Direct evidence is provided for the court's review, titled Exhibit 19;

4. Plaintiff was not properly treated until after he left the Coffield Unit. Everytime Plaintiff went in to see a "nurse" or "provider", he was given a dramatic display of false emotion, he was told "Why would the security beat you up?" or "Prison officials do not act in that manner." Truth is, on Coffield there is a use of excessive force almost daily. A review on the Plaintiff's Partial Initial Disclosures, the nurses never gave a true account of those appointments. At no time has the Plaintiff, being "High Security" were the handcuffs take off to examine whether he had full range of arms, or asked to bend forward or backward. His injuries were never looked at.

5. It was not until the Plaintiff had a good opportunity to view the evidence he came to the understanding, the reasons why his examinations were shoddy, or at the begining when he tried to be seen by a provider or even a nurse, was because these people knew the Defendant(s) had beat the Plaintiff. It explains the refusal to see him, the inadequate investigations, the refusal to ask any of the other prisoners if they had wanted to file a witness statement, and the Defendant(s) attempts at diminishing his injury(s), and the nurse claiming he had minor injuries; This led the Plaintiff to believe, these people have done this before, that it, having to cover-up other use of excessive forces; this also leads the Plaintiff to believe the Defendant(s) themselves have beaten other prisoners, because these Defendant(s) beat him, with out the fear of facing disciplinary by their supervisors.

(Docket Entry No. 60, pp. 39-41).

## IV.    The Excessive Force Claim

Perez complains of the use of excessive force. The Supreme Court, in *Hudson v. McMillian,* 503 U.S. 1 (1992), held that inmates raising allegations of excessive force must show that the force used was malicious and sadistic for the very purpose of causing harm rather than in a good faith effort to restore discipline; the Court also noted that the Eighth Amendment's prohibition of cruel

and unusual punishment necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort "repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 10.

At the time of the use of force, Perez was a convicted felon. The Eighth Amendment is the primary source of protection against the official use of force for convicted prisoners. *Whitley v. Albers,* 475 U.S. 312, 327 (1986). As such, the *Hudson* standard is the proper test to apply. *Valencia v. Wiggins,* 981 F.2d 1440, 1446 (5th Cir.), *cert. denied,* 509 U.S. 905 (1993).

In accordance with the decision in *Hudson,* the Fifth Circuit has identified five factors which should be considered in determining whether an unnecessary and wanton infliction of pain was done in violation of an inmate's right to be free from cruel and unusual punishment. These factors are: (1) the extent of the injury suffered; (2) the need for the application of force; (3) the relationship between the need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response. *Baldwin v. Stalder,* 137 F.3d 836, 839 (5th Cir. 1998); *Hudson v. McMillian,* 962 F.2d 522, 523 (5th Cir. 1992). It should be noted that not every push or shove, even if it may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights. *Johnson v. Glick,* 481 F.2d 1028, 1033 (2nd Cir.), *cert. denied sub nom. John v. Johnson,* 414 U.S. 1033 (1973) (cited with approval in *Hudson,* 503 U.S. at 9). The Court will consider the *Hudson* factors as to Perez's claim of excessive force.

The first *Hudson* factor concerns the extent of the injuries suffered. An inmate must show more than a de minimis injury resulting from the use of excessive force to show a violation of the Eighth Amendment. *Knight v. Caldwell,* 970 F.2d 1430, 1432-33 (5th Cir. 1992); *Jackson v.*

21

*Culbertson*, 984 F.2d 699, 700 (5th Cir. 1993). Although the injury must be more than de minimis, it need not be significant. *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997) (citing *Hudson*). In *Siglar*, the Fifth Circuit described the conduct and injury as follows:

> [the corrections officer] twisted Siglar's arm behind his back and twisted Siglar's ear. Siglar's ear was bruised and sore for three days but he did not seek or receive medical treatment for any physical injury resulting from the incident. There is no allegation that he sustained long term damage to his ear.

*Id.* at 193. The *Siglar* court analyzed "whether Siglar's bruised ear amounts to a 'physical injury' that can serve as the basis for his excessive force" claim. The court concluded that because "Siglar's alleged injury – a sore, bruised ear lasting for three days – was de minimis," he had not raised a valid claim for excessive force. *Id.*

In *Brown v. Lippard*, 472 F.3d 384 (5th Cir. 2006), the Fifth Circuit stated that in evaluating use of force claims, the courts may look to the seriousness of the injury to determine whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur. *Brown*, 472 F.3d at 387, citing *Whitley v. Albers*, 475 U.S. 312, 321 (1986). The Fifth Circuit went on to state that injuries are insufficient to support an excessive force claim where there is *no* physical injury, or where the injury is extremely minor, such as a bruise caused by having one's ear twisted, but that the attack and injuries described by Brown, which included one-centimeter abrasions on his left knee and left shoulder, pain in his right knee, and tenderness around his left thumb, "cannot be likened to a twisted ear."

In *Gomez v. Chandler*, 163 F.3d 921, 924-25 (5th Cir. 1999), the Fifth Circuit contrasted the use of force and resulting injury with the facts in *Siglar*. The court noted that Gomez received

medical treatment for his injury. The *Gomez* court observed that the force used against Siglar was far briefer and less intense and less calculated to produce real physical harm than that applied to Gomez. Guards allegedly knocked Gomez down so his head struck the concrete floor, scraped his face against the floor, repeatedly punched him in the face for about five minutes, kicked him in the face and head, then continued to punch Gomez using fists. Gomez allegedly suffered "cuts, scrapes, contusions to the face, head, and body." On this record, the Fifth Circuit concluded that it could not say as a matter of law that Gomez's injuries were no more than de minimis.

In the instant case, Perez alleges that during the use of force, the defendants took the following actions: he was punched on the side of the head with a closed fist; he was almost knocked to the ground; he was punched with extreme force in the face and the sides of the head; Defendant Pittcock attempted to break Perez's fingers; someone stomped on Perez's ankles and legs; his head was slammed to the floor; and Defendant Pittcock drove his finger and pen into Perez's right eye. Perez complained of discoloration of his right eye, vision problems, and pain in his back, neck and fingers.

The Court has carefully reviewed Perez's medical records following the use of force on June 30, 2015. The use-of-force physical and the use-of-force nursing note taken soon after the use of force indicate Perez suffered minor injuries as a result of the use of force. Immediately following the use of force, Perez was examined cell-side on June 30, 2015, for a pre-segregation evaluation. Perez had a .5 cm cut below his right eye and a minor cut to the inner right side of his right little finger. "No other injuries were voiced or noted." (Docket Entry No. 51-2, p. 6). Also on June 30, 2015, Perez denied any injuries and any respiratory difficulty. Perez had a minor .5 cm laceration below his right eye and a minor laceration on the inner side of his right hand little finger. Nurse

Lang determined that Perez had no adverse health effects from the use of force. (Docket Entry No. 51-2, p. 3).

Sergeant Gunnels took still photos of the offender, front and back. He also took photographs of the two injuries. The Court has reviewed the four photographs taken immediately after the use of force. The photograph of Perez's face shows minimal redness below his right eye. (Docket Entry No. 51-1, Exhibit A, p. 42). The photograph of Perez's right hand shows a very small round area of redness on the right pinky finger. (*Id.* at 43). The two other photographs show frontal and rear views of Perez standing without a shirt. No injuries are visible in these photographs. (*Id.* at 40-41).

Perez's medical records indicate that the lacerations under his eye and on his pinky finger were so minor that they were not visible the following day. (Docket Entry No. 51-2, Exhibit B, pp. 8, 12). Perez was seen by medical staff when he transferred to the Coffield Unit on July 1, 2015, and again on July 8, 2015. (*Id.* at 8-17). Perez did not have any cuts or bruises and did not report any pain as a result of the use of force at either evaluation. (*Id.* at 8, 12).

On July 17, 2015, Perez complained of pain in his back, neck, fingers, and eyes. Perez attributed the pain to the use of force on June 30, 2015. Perez stated that the pain was intermittent and aggravated by daily activities. Nurse Martin noted that Perez's joints were normal. Perez had full range of motion in his upper and lower extremities and neck. Perez was able to bend forward and backward. Perez's movement and gait were normal. His posture was erect, and he was able to sit easily. Nurse Garner advised Perez that warm water in the shower could reduce discomfort. Nurse Garner prescribed Acetaminophen, two tablets three times a day for three days. (Docket Entry No. 51-2, pp. 21-24).

On August 4, 2015, medical personnel performed a visual acuity test on Perez which showed

that he had the following visual acuity: Far vision: right eye 20/70; left eye 20/40; both eyes 20/40. Near vision: right eye 20/100; left eye 20/70; both eyes 20/70. Perez was referred to optometry. (Docket Entry No. 51-2, p. 25).

On August 16, 2015, Perez again complained of injuries following the use of force. He asked to see a provider regarding injuries to his fingers and eye. He complained of pain in his back, neck, and eye. He further complained of possible nerve damage to both legs as a result of the use of force. Nurse Martin noted that the use of force had taken place on June 30, 2015; he had been treated for minor cuts under his right eye and right little finger; and both areas had been resolved. She further noted: Perez had been evaluated by a provider; a visual acuity test was performed on August 4, 2015; Perez had full range of motion in his upper and lower extremities; and he denied any pain or discomfort during the examination. Nurse Martin diagnosed Perez with extremity pain due to arthritis and other disorders of the eye. He was prescribed Acetaminophen and artificial tears. (Docket Entry No. 51-2, pp. 28-29).

On August 25, 2015, Perez complained of pain in his back, neck, and fingers. He further complained of possible nerve damage to both legs. Nurse Pierson diagnosed Perez with degenerative arthritis and extremity pain.

On August 30, 2015, Perez complained of injuries following the use of force. He mentioned pain in his right hand and digits, left hip, and leg. He complained of a throbbing pain or ache. He stated that the pain was radiating. Perez reported that he noticed changes to moles on his torso. Nurse noted that Perez had multiple pinpoint flesh-colored moles scattered over the anterior and posterior torso. Nurse Martin advised Perez that warm water in the shower can reduce discomfort. He was prescribed Acetaminophen for three days. (Docket Entry No. 51-2, pp. 36-38).

On September 3, 2015, Perez complained of nerve damage to his bilateral lower extremities. He also complained of pain in his neck, back, and fingers. He stated that his prescriptions for Ibuprofen had to be renewed because he was the subject of multiple uses of force. Nurse Assava performed a musculoskeletal evaluation and noted: full range of motion in neck and spine, no swelling or deformity was noted. Perez had full range of motion in both lower extremities. He was able to ambulate and sit and stand without difficulty. Perez had good muscle strength and tone. There was no muscle atrophy and sensation was intact. Nurse Assava renewed Perez's prescription for Ibuprofen for thirty days. (Docket Entry No. 51-2, pp. 40-41).

Perez's injuries are consistent with similar injuries that were found de minimis by the Fifth Circuit in excessive use of force claims. *See, e.g., Lee v. Wilson*, 237 F. App'x 965 (5th Cir. 2007) (busted lip that bled and headaches de minimis injuries in the context that the actions taken by defendants were a reasonable attempt to maintain order); *Mosley v. White*, 464 F. App'x 206 (5th Cir. 2010) (finding plaintiff did not meet his evidentiary burden that his injuries were objectively harmful enough to constitute a constitutional violation where plaintiff alleged he suffered momentary blindness, cuts and abrasions in and around the eye, and an infected eye from defendant repeatedly poking plaintiff in the face and eye); *Potts v. Hill*, 182 F.3d 913 (5th Cir. 1999) (injuries de minimis from use of force where plaintiff suffered a non-bleeding cut on the inside of his mouth after being struck by defendant and mouth too sore to wear dentures for three weeks); *Young v. Saint*, 990 F.2d 627 (5th Cir. 1993) (plaintiff's injuries de minimis where defendant struck plaintiff's hand with a metal spatula which drew blood, caused a slight decrease in flexion and extension, and left a few small scratches); *but cf., Edwards v. Stewart*, 37 F. App'x 90 (5th Cir. 2002) (plaintiff made sufficient showing of more than de minimis physical injury where he sought medical treatment for

cuts to his fingers and thumb, headache, neck pain and lacerations to the ear after repeatedly being pushed to the floor, kicked, and beaten with a cane in addition to being sprayed with pepper gas).

There are numerous cases in which the Fifth Circuit has affirmed the entry of summary judgment based on a summary judgment record showing only a de minimis injury. *See Galada v. Payne*, 421 F. App'x 460, 462 (5th Cir. 2011) (affirming summary judgment and holding "[a]lthough a showing of 'significant injury' is not necessary, we require that the plaintiff have suffered at least some form of injury that is more than de minimis"); *Wilson v. Taylor*, 100 F. App'x 282, 283 (5th Cir. 2004) (affirming district court's grant of summary judgment on the basis of qualified immunity because prisoner "failed to submit summary judgment evidence showing that he has suffered a more than de minimis physical injury" after being "body slammed onto a concrete floor and punched in the face" by an officer who was over seven feet tall and weighed more than 300 pounds); *Bradshaw v. Unknown Lieutenant*, 48 F. App'x 106 (5th Cir. 2002) (affirming district court's dismissal of prisoner's excessive force claim when alleged injuries consisting of "burning eyes and skin for approximately 24 hours, twitching of his eyes, blurred vision, irritation of his nose and throat, blistering of his skin, rapid heartbeat, mental anguish, shock and fear" were de minimis).

In *Brooks v. City of West Point, Miss.*, the Fifth Circuit held that "[b]ecause Brooks has not proffered evidence that the officers caused him more than a de minimis injury, the district court did not err in granting summary judgment on his excessive force claim" based on the summary judgment record that showed Brooks "suffered abrasions to his hands and knees, some pain in his back and neck, and unspecified problems with his asthma," adding that "[w]e have held injuries of this type to be de minimis." No. 14-60357, 2016 WL 556360, at *3 (5th Cir. Feb. 11, 2016) (citations omitted).

In response to the Defendants' motion for summary judgment, Perez asserts that he had a black and red/bloody eye, that he had not showered in 3-4 days, that he did not have clean clothes, that he had sustained an injury to his eye, that his fingers were swollen, that he informed the nurse that the Defendants had beaten him, that he had a severe headache and that he hurt all over. (Docket Entry No. 60, p. 11). Perez further states that the injuries he sustained following the use of force on June 30, 2015, are "still ongoing until this day." (*Id.* at 21). Perez argues that the Defendants rely on medical records to present a diminished state of his injuries. He states that the referenced medical examinations took place while he was in administrative segregation, and that as a high-risk prisoner, Perez was not allowed to remove his handcuffs. Perez maintains that the nurses never got out of their seats to examine Perez or ask Perez to perform certain acts to evaluate Perez's condition. (*Id.* at 12). Perez states that the Defendants attempted to gouge out his eye and that he lost sight as a result. (*Id.* at 15, 17). He also stated that the nurses intentionally delayed examining Perez so that there would be time for his injuries to fade or heal

Perez relies on his personal affidavit in which he describes the medical care following the use of force. (Docket Entry No. 60, pp. 39-41). While the nonmovant may offer a self-affidavit as evidence of a genuine issue to avoid summary judgment, "conclusory allegations supported by a conclusory affidavit will not suffice to require a trial." *Shaffer v. Williams*, 794 F.2d 1030, 1033 (5th Cir. 1986). If the party opposing summary judgment relies solely on conclusory affidavits or pleadings to demonstrate a fact issue, the movant does not have to rebut that evidence with contrary facts. *Travelers Ins. Co. v. Liljeberg Enter., Inc.*, 7 F.3d 1203, 1207 (5th Cir. 1993)(citing *Shaffer*, 794 F.2d at 1033). Perez's conclusory affidavit does not serve to create a genuine issue of material fact as to whether he sustained a more than de minimis injury as a result of the use of force.

As noted above, the *Siglar* court analyzed whether Siglar's bruised ear amounted to a 'physical injury' that could serve as the basis for his excessive force claim. The Fifth Circuit concluded that Siglar's alleged injury, which consisted of a sore, bruised ear lasting for three days, was de minimis, and therefore, Siglar had not raised a valid claim for excessive force. In the case at bar, Perez sustained a half-centimeter cut below his right eye and a minor cut on his right pinky finger. The alleged use-of-force took place on June 30, 2015, yet Perez's injuries were not visible the following day. Perez's injuries are more akin to those injuries suffered by Siglar, a twisted ear which required no medical treatment. *Siglar v. Hightower,* 112 F.3d 191 (5th Cir. 1997). Like Siglar, Perez's minor cuts under his right eye and on his pinky finger did not require medical treatment. As in *Siglar*, Perez makes no allegation that he sustained long-term damage to his right eye or right pinky finger. From July 17, to September 3, 2015, Perez repeatedly complained of nerve damage to his bilateral lower extremities as well as pain in his neck, back, and fingers. He continued to report to medical personnel that his pain was the result of the uses of force on June 30, 2015. Medical personnel conducted several musculoskeletal evaluations and noted that: Perez had full range of motion in his neck and spine; there was no swelling or deformity; he had full range of motion in both lower extremities; he was able to ambulate and sit and stand without difficulty; he had good muscle strength and tone; and there was no muscle atrophy and sensation was intact. Though Perez attributed his pain to the use of force on June 30, 2015, nurses diagnosed Perez with extremity pain due to degenerative arthritis. The medical records show that Perez had been diagnosed with degenerative arthritis as early as 2009. Nurses prescribed medications to relieve the pain. Though Perez claims he was the victim of a brutal beating, the medical records refute Perez's allegations. Like Siglar, Perez's injuries were de minimis. This factor weighs against Perez.

The second *Hudson* factor concerns the need for the application of force. On June 30, 2015, Defendants Ramadan and Taylor were escorting offenders in administrative segregation to the showers. When Defendant Ramadan escorted Perez to the showers, Perez began arguing with Defendant Ramadan about the water temperature and demanded she turn the water temperature down. Defendant Ramadan explained to Perez that the water temperature is the same for every offender and that she could not adjust it. Perez became aggressive, reached through the bars of the shower, grabbed onto Defendant Ramadan's right arm, and scratched her forearm and hand. After Defendant Ramadan freed herself from Perez's grasp, she notified a superior, Defendant Pittcock, that Perez had committed a staff assault. Defendant Pittcock ordered Perez to submit to hand restraints, so he could be taken to pre-hearing detention as a result of his assault on Defendant Ramadan. When Perez refused to submit to hand restraints and exit the shower, Defendant Pittcock called Defendant McClellan, a ranking officer, for assistance. When Defendant McClellan arrived, he was able to reason with Perez, who agreed to exit the shower and submit to restraints. Once Perez was safely restrained, Defendant Pittcock and Defendant McClellan proceeded to escort Perez to his cell. While escorting Perez back to his cell, Defendant McClellan instructed Defendant Taylor to contact the medical department and request that a healthcare provider meet them at Perez's cell to perform a pre-hearing detention physical.

When Perez learned that he would be placed in pre-hearing detention, he became aggressive, attempted to argue the merits of his disciplinary case, and tried to pull away from Defendants McClellan and Pittcock. Defendant McClellan ordered Perez to stop resisting their escort and proceed to his cell. Perez refused, began to curse at Defendant McClellan, broke loose of Defendant McClellan's grasp on his arm, and turned on Defendant Pittcock. Defendants McClellan and

Pittcock then wrapped their arms around Perez's upper torso, placed him on the floor, and applied downward pressure as Perez continued to physically resist and threaten to harm correctional staff. Defendant Taylor called for backup, and additional officers arrived with a video camera to document the use of force and relieve Defendants McClellan and Pittcock. Perez then complied with orders and agreed to be escorted to his cell by the relieving officers.

The summary judgment evidence shows that Perez was acting in a verbally and physically aggressive manner toward the escorting officers. Perez posed a clear and immediate threat to institutional safety and security. Defendant McClellan and Pittcock initiated the use of force in response to Perez's successful effort to break free of Defendant McClellan's grasp. Perez simultaneously turned on Defendant Pittcock while yelling threats of physical harm.

The need for the application of force was great. The officers were faced with an unruly, aggressive inmate who refused to follow orders. The second *Hudson* factor weighs in favor of the Defendants.

The third *Hudson* factor involves the relationship between the need and the amount of force used. The Defendants perceived a threat. The summary judgment evidence shows that Perez had created a disturbance in the shower because he thought the water temperature was too hot. He attempted to grab Defendant Ramadan's arm through the bars and scratched her in the course of doing so. Defendant McClellan responded to Perez's request for a ranking officer. As Defendant McClellan and Pittcock were escorting Perez to his cell, Perez became agitated when he learned that he would be placed in pre-hearing detention for assaulting Defendant Ramadan. When Perez started pulling away, Defendant McClellan ordered Perez to slow down. Perez eventually pulled away from Defendant McClellan and Defendant Pittcock. Upon breaking free, Perez turned aggressively toward

Defendant Pittcock. Defendant McClellan and Defendant Pittcock then wrapped their arms around Perez's upper torso and applied downward pressure as Perez continued to physically resist. Defendant McClellan and Defendant Pittcock restrained Perez until he became compliant with their orders. The Defendants perceived a threat because Perez had just assaulted Defendant Ramadan in the shower. Perez had refused several orders to stop resisting their efforts to escort him to his cell. They reasonably believed that Perez posed a threat to institutional security because he was causing a disturbance. The Defendants responded to the threat by wrapping their arms around Perez's upper torso and placing him on the floor.

As to the third factor, the amount of force used by these particular officers was simply to bear their weight down on Perez's torso to immobilize him while the situation stabilized. That satisfied the need for force without applying more force than was necessary. The third *Hudson* factor weighs in favor of the Defendants.

The fourth *Hudson* factor concerns the threat reasonably perceived by the responsible officials. As noted in the discussion of the third *Hudson* factor, the Defendants reasonably perceived that Perez posed a threat to institutional safety. Perez had refused a direct order to stop resisting efforts to escort him to his cell. Instead of allowing Defendant McClellan and Defendant Pittcock to escort him to his cell, Perez pulled away and turned toward Defendant Pittcock in an aggressive manner. Perez's act of pulling away and turning toward Defendant Pittcock posed a threat to institutional security because Perez's disruptive behavior required intervention by Defendant McClellan and Defendant Pittcock. Perez also continued to verbally threaten prison officials.

As to the fourth factor, in addition to Perez's obvious aggressive attitude and refusal to remain still, the officers perceived a threat. Perez had previously assaulted Defendant Ramadan

while Perez was in the shower. They observed Perez pulling away from Defendants McClellan and Pittcock. Perez escaped their grip and turned aggressively toward Defendant Pittcock. The danger was clear.

The summary judgment evidence shows that the Defendants reasonably perceived that Perez posed a threat to institutional security. The fourth *Hudson* factor weighs in favor of the Defendants.

The fifth *Hudson* factor concerns the efforts made to temper the severity of a forceful response. The summary judgment evidence shows that officers repeatedly instructed Perez to stop pulling away from the escorting officers. The summary judgment evidence shows that the Defendants took steps to temper the severity of the forceful response. Defendant McClellan placed Perez in hand restraints before he was removed from the shower. As Defendant McClellan and Defendant Pittcock escorted Perez to his cell, Perez started pulling away. Defendant McClellan ordered Perez to slow down and to stop resisting. Perez refused the order and succeeded in pulling away from Defendant McClellan. Perez then turned on Defendant Pittcock. Defendant McClellan and Defendant Pittcock then wrapped their arms around Perez's upper torso and applied downward pressure until Perez was on the floor. Defendants McClellan and Pittcock secured Perez on the floor until Perez became compliant.

As to the fifth factor, these particular officers tempered their response by applying body weight until Perez became calm and compliant with orders to stop resisting. The fifth *Hudson* factor weighs in favor of the Defendants.

In *Wilkins v. Gaddy,* 559 U.S. 34 (2010), the Supreme Court stated that the core judicial inquiry when a prisoner alleges excessive force is not whether a certain quantum of injury was sustained, but rather whether force was applied in a good faith effort to maintain discipline or

33

maliciously and sadistically for the very purpose of causing harm. The Supreme Court acknowledged that the extent of injury could provide some indication of the amount of force applied, and noted that "not every malevolent touch by a prison guard gives rise to a federal cause of action." The prisoner in *Wilkins* suffered multiple physical injuries requiring medical attention, including a bruised heel, lower back pain, increased blood pressure, migraine headaches, dizziness, psychological trauma, and mental anguish including depression, panic attacks, and nightmares. He received X-rays and was prescribed medications. There is a conceptual distinction between a de minimis injury and a de minimis use of force. *Wilkins v. Gaddy, supra*, 559 U.S. at 38 ("Injury and force ... are only imperfectly correlated, and it is the latter that ultimately counts"). The fact that an inmate may have sustained only minimal injury does not end the inquiry, and an inmate who has been subjected to gratuitous force by prison guards "does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Id.* For Eighth Amendment purposes, evidence of the existence and extent of injuries, while not dispositive, may be considered in conjunction with other factors to help determine whether the force used was excessive. *See Brown v. Lippard*, 472 F.3d 384, 385 (5th Cir. 2006) ("In evaluating excessive force claims, courts may look to the seriousness of the injury to determine 'whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.'").

Although the Supreme Court in *Hudson v. McMillian*, 503 U.S. 1, 5–9 (1992), and *Wilkins v. Gaddy*, 559 U.S. 34, 37–39 (2010), criticized courts of appeals for requiring "some arbitrary quantity of injury" to maintain an excessive-force claim, the Court did not eliminate the required element of at least some harm or injury to maintain an Eighth Amendment claim. *Abbott v. Babin,*

2018 WL 3699144 (5th Cir. 2018).

Perez alleges that he was injured during the use of force on June 30, 2015. He claims that his right eye was injured and his fingers on his right hand were nearly broken. The decision in *Wilkins* requires this Court to shift its focus away from the quantum of injury sustained by Perez. Instead, this Court must consider whether force was applied in a good faith effort to maintain discipline or maliciously and sadistically for the very purpose of causing harm.

This Court finds that the Defendants applied force in a good faith effort to maintain discipline and that they did not use force maliciously and sadistically for the very purpose of causing harm to Perez. In summary, all of the *Hudson* factors weigh against Perez. The summary judgment evidence shows that the force used was not malicious or sadistic and for the very purpose of causing harm, which is the essential element of an excessive use of force claim.

In *Wilson v. Taylor*, 100 F. App'x 282, 2004 WL 1240514 (5th Cir. 2004), the Fifth Circuit considered a nearly identical claim. In his pro se complaint, Wilson alleged that on November 9, 2002, Officer Taylor, who apparently was more than seven feet tall and weighed more than 300 pounds, violated his Eighth Amendment rights by "body slamming" him to a concrete floor and punching him in the face. This use of force followed a dispute between Wilson and Taylor concerning an overflowing toilet in Wilson's cellblock. The parties disputed whether Wilson threatened Taylor prior to the use of force, or whether Taylor had threatened Wilson.

The Fifth Circuit determined that the district court had not erred in granting summary judgment to defendant Taylor on this claim on the basis of qualified immunity because Wilson had failed to submit summary judgment evidence showing that he had suffered a more than de minimis physical injury as a result of the November 9, 2002 incident (or that Taylor's employment of force

35

was such as to be "repugnant to the conscience of mankind"). *See Gomez v. Chandler,* 163 F.3d 921, 924 (5th Cir. 1999); *Siglar v. Hightower,* 112 F.3d 191, 193 (5th Cir. 1997). The Fifth Circuit concluded that the summary judgment evidence before the district court did not suffice to establish the violation of a constitutional right, and Taylor was entitled to qualified immunity. *Price v. Roark,* 256 F.3d 364, 369 (5th Cir. 2001).

An analysis of the five *Hudson* factors after reviewing the summary judgment evidence presented by the Defendants reveals that the Defendants did not violate Perez's Eighth Amendment rights during the incident at issue. Although Perez suffered an injury from the use of force, the injury was the result of Perez's refusal to walk as instructed; the force used was the force necessary to move Perez from the shower to his cell.

The Fifth Circuit has consistently found no excessive use of force violations when prison officials employ force against inmates refusing to comply with orders. *See Baldwin v. Stalder,* 137 F.3d 836, 840-41 (5th Cir. 1998); *Thomas v. Comstock,* 222 F. App'x 439 (5th Cir. Mar. 16, 2007) (not designated for publication) (use of mace against inmate who refused to obey a lawful order did not violate the Eighth Amendment).

No reasonable jury could find that the Defendants' conduct resulted in a clearly unreasonable use of force against Perez; this is simply not the sort of force that is repugnant to the conscience of mankind. *Hudson v. McMillian,* 503 U.S. 1, 8 (1992).

The question at summary judgment is whether "the record, taken as a whole, could . . . lead a rational trier-of-fact to find for the non-moving party." *Kariuki v. Tarango,* 709 F.3d 495, 501 (5th Cir. 2013) (defining a genuine dispute of material fact). "Credibility determinations have no place in summary judgment proceedings" because "non-movants' summary judgment evidence must be

36

taken as true." *Richardson v. Oldham*, 12 F.3d 1373, 1379 (5th Cir. 1994). All facts and inferences must be viewed in the light most favorable to the non-movant. *Love v. Nat'l Med. Enters.*, 230 F.3d 765, 770 (5th Cir. 2000). However, "[s]elf-serving allegations are not the type of significant probative evidence required to defeat summary judgment," and "a vague or conclusory affidavit [without more] is insufficient to create a genuine issue of material fact in the face of conflicting probative evidence." *Kariuki*, 709 F.3d at 505 (internal quotation marks omitted). Therefore, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of . . . summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Although the Court must consider the evidence with all reasonable inferences in the light most favorable to the non-moving party, the nonmovant must produce specific facts to demonstrate that a genuine issue exists for trial. *Webb v. Cardiothoracic Surgery Assocs. of N. Tex.*, 139 F.3d 532, 536 (5th Cir. 1998). The nonmovant must go beyond the pleadings and use affidavits, depositions, interrogatory responses, admissions, or other evidence to set out specific facts showing an issue for trial. *Gossett v. Du–Ra–Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978). While the nonmovant may offer a self-affidavit as evidence of a genuine issue to avoid summary judgment, "conclusory allegations supported by a conclusory affidavit will not suffice to require a trial." *Shaffer v. Williams*, 794 F.2d 1030, 1033 (5th Cir. 1986). If the party opposing summary judgment relies solely on conclusory affidavits or pleadings to demonstrate a fact issue, the movant does not have to rebut that evidence with contrary facts. *Travelers Ins. Co. v. Liljeberg Enter., Inc.*, 7 F.3d 1203, 1207 (5th Cir. 1993)(citing *Shaffer*, 794 F.2d at 1033); *see also Broadway v. Montgomery*, 530 F.2d 657, 660 (5th Cir. 1976)(nonmovant's affidavit reciting unsupported, conclusory allegations

insufficient to avoid summary judgment); *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009)(a summary assertion made in an affidavit is simply not enough proof to raise a genuine issue of material fact). As such, "[t]wo opposing conclusory affidavits do not preclude summary judgment." *Travelers*, 7 F.3d at 1207.

This Court finds Perez, the nonmovant, fails to defeat the Defendants' Motion for Summary Judgment. Perez needs "more persuasive evidence to support" his claim. *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). This Court additionally finds that Perez's affidavit is conclusory and self-serving. *Shaffer*, 794 F.2d at 1033. Perez has merely made bald assertions that, when confronted by his medical records, fail. *Scott*, 550 U.S. at 380. Perez's summary assertions in his affidavit are simply not enough to raise a genuine issue of material fact. *Sanford*, 555 F.3d at 181. This Court finds that the Defendants have shown there are no genuine factual issues that necessitate a trial. *Gossett*, 569 F.2d at 872. Perez failed to support his claim and demonstrate a constitutional deprivation, as he relied solely on conclusory allegations. *Fee v. Herndon*, 900 F.2d 804, 807 (1990).

## V.      Qualified Immunity

The Defendants assert that as a matter of law, they are entitled to qualified immunity because Perez failed to allege a constitutional violation and because the undisputed evidence shows that their actions were objectively reasonable in light of clearly established law. (Docket Entry No. 51, Defendants' Motion for Summary Judgment, p. 4)

Qualified immunity shields government officials from liability when they are acting within their discretionary authority and their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S.

800, 818 (1982); *Flores v. City of Palacios,* 381 F.3d 391, 393-94 (5th Cir. 2004).

In reviewing a motion for summary judgment based on qualified immunity, a district court undertakes a two-step analysis. *Flores,* 381 F.3d at 395. First, a court must determine whether a statutory or constitutional right would have been violated on the facts alleged. *Saucier v. Katz,* 533 U.S. 194, 200 (2001); *Aucoin v. Haney,* 306 F.3d 268, 272 (5th Cir. 2002). If no constitutional right would have been violated were the allegations established, then the inquiry ends. *Saucier,* 533 U.S. at 201. If a violation is properly alleged, then the court proceeds to the second step in which it determines whether the defendant's actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Flores,* 381 F.3d at 395 (quoting *Hope v. Pelzer,* 536 U.S. 730, 739 (2002)). Finally, if the law was clearly established at the time of the incident, the court must decide whether the defendant's conduct was objectively reasonable. *Aucoin,* 306 F.3d at 272. An official's conduct is objectively reasonable unless all reasonable officials in the defendant's circumstances would have then known that the conduct violated the Constitution. *Hampton v. Oktibbeha Cnty. Sheriff Dep't,* 480 F.3d 358, 363 (5th Cir. 2007). Even if the government official's conduct violates a clearly established right, the official is nonetheless entitled to qualified immunity if his conduct was objectively reasonable. *Hernandez ex. rel. Hernandez v. Tex. Dep't of Protective & Regulatory Servs.,* 380 F.3d 872, 879 (5th Cir. 2004).

The two-step procedure for determining qualified immunity established in *Saucier v. Katz,* 533 U.S. 194, 200 (2001), is no longer mandatory. *See Pearson v. Callahan,* 555 U.S. 223, 236 (2009) ("On reconsidering the procedure required in *Saucier,* we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory."). Courts are free to consider the second prong without first deciding whether the facts show a constitutional violation.

*Id.* The "decision does not prevent the lower courts from following the *Saucier* procedure; it simply recognizes that those courts should have the discretion to decide whether that procedure is worthwhile in particular cases." *Id.* at 242.

Once a government officer pleads the affirmative defense of qualified immunity, the burden shifts to the plaintiff to rebut the defense by establishing that the employee's allegedly wrongful conduct violated clearly established law. *Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001). This burden requires the plaintiff to plead "claims of specific conduct and actions giving rise to a constitutional violation." *Baker v. Putnal*, 75 F.3d 190, 195 (5th Cir. 1996). "[T]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Mangieri v. Clifton*, 29 F.3d 1012, 1017 (5th Cir. 1994) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

In their motion for summary judgment, the Defendants invoke qualified immunity. After the Defendants properly invoke qualified immunity, Perez then bears the burden to rebut its applicability. *Kovacic v. Villareal*, 628 F.3d 209, 211 (5th Cir. 2010). Such a rebuttal requires showing that all reasonable officials—similarly situated—would have known that the Defendant's actions violated the Constitution. *See Tamez v. Matheny.* 589 F.3d 764, 770 n.2 (5th Cir. 2009); *Thompson v. Upshur Cnty.*, 245 F.3d 447, 460 (5th Cir. 2001). Conclusory allegations are insufficient to overcome the qualified immunity defense. *Williams-Boldware v. Denton Cnty., Tex.*, 741 F.3d 635, 643-44 (5th Cir. 2014).

Here, as found above, Perez has not shown that a constitutional violation occurred. Similarly, he failed to demonstrate that the Defendants acted in an objectively unreasonable manner. The summary judgment evidence shows that their actions were objectively reasonable given Perez's

actions. Accordingly, the Defendants are entitled to qualified immunity from suit in this action.

## VI.  The Motion to Strike

Perez filed a motion to strike evidence submitted by the Defendants in response to the Defendants' motion for summary judgment. (Docket Entry No. 59). This motion challenges the authentication of certain documents.

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). "The standard for authenticating evidence is low and may be satisfied 'by evidence sufficient to support a finding that the matter in question is what its proponent claims.'" *United States v. Carroll,* 2000 WL 45870, at *3 (E.D. La. Jan. 20, 2000) (quoting *United States v. Arce*, 997 F.2d 1123, 1128 (5th Cir. 1993); *see also United States v. Jackson,* 625 F.3d 875, 881 (5th Cir. 2010) ("The Fifth Circuit does not require conclusive proof of authenticity before allowing the admission of disputed evidence . . . . [Rule 901] merely requires some evidence which is sufficient to support a finding that the evidence in question is what its proponent claims it to be."). Federal Rule of Evidence 901(b) lists nonexclusive examples of appropriate methods of authentication, including (1) the testimony of a witness with knowledge; (2) nonexpert opinion on handwriting; (3) comparison by the trier of fact or expert witness; and (4) distinctive characteristics, appearance, contents and the like. *See* Fed. R. Evid. 901(b). "A document may be authenticated with circumstantial evidence, 'including the document's own distinctive characteristics and the circumstances surrounding its discovery.'" *Carroll,* 2000 WL 45870, at *3 (citing *Arce,* 997 F.2d at 1128).

Megan Johnston testified that she was employed as the Administrative Monitor for the Use

of Force Department for the Texas Department of Criminal Justice (TDCJ). She explained that she was the custodian of the Use of Force Records for the TDCJ, and that the records were maintained in the regular course of business. She reviewed the records for Roberto Perez pertaining to the time period of June 2014 to December 2015. She testified that the records attached were the original or exact duplicates of the originals.

Lisa Lopez testified that she was the Custodian of Records at The University of Texas Medical Branch - Correctional Managed Care, Health Services Archives. She stated that she was the individual who can authenticate and certify as official, copies of medical records at the TDCJ Health Services Archives. Attached were the records for the time period January 1, 2015 to December 31, 2015, from the medical records of Roberto Perez, TDCJ #1189927. These records were kept in the regular course of business by an employee or representative of UTMB - Correctional Managed Care with knowledge of the act, event, condition, opinion or diagnosis, and the record was made at or near the time or reasonably soon thereafter. The records attached were the original or exact duplicates of the original medical records maintained by TDCJ Health Services Archives.

Johnston and Lopez testified to the authenticity of the attached documents. Their testimony as to the documents' authenticity provides sufficient circumstantial evidence for this Court to find that the documents authenticated in the Johnston and Lopez affidavits are what they purport to be.

Perez's motion to strike evidence submitted by the Defendants, (Docket Entry No. 59), is DENIED.

## VII. Conclusion

Based on the pleadings, the motion, the summary judgment record, and the applicable law, this Court GRANTS the motion for summary judgment filed by Defendants Ramadan, Taylor,

McClellan, and Pittcock (Docket Entry No. 51). Perez's Motion to Strike, (Docket Entry No. 59),

is DENIED. Perez's use-of-force claims against the named defendants are DISMISSED.

SIGNED at Houston, Texas, on ___ **JAN 3 1 2019** ___.

_____
ALFRED H. BENNETT
UNITED STATES DISTRICT JUDGE